UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Case No. **24-cr-443** (BAH) |
| | : | |
| FRANK DAHLQUIST, | : | |
| | : | |
| Defendant. | : | |

**DEFENDANT FRANK DAHLQUIST'S MOTIONS *IN LIMINE*
WITH INCLUDED MEMORANDUM OF LAW**

Defendant FRANK DAHLQUIST ("Dahlquist"), by counsel, hereby files this omnibus MOTIONS *IN LIMINE* to exclude evidence *in limine* as more prejudicial than probative under Rule 403 of the Federal Rules of Evidence and likely to cause jury confusion.

For her reasons Dahlquist includes her argument and statements of law in this included memorandum of law.

## I.    INTRODUCTION

Dahlquist moves for exclusion of the various specific categories of evidence, argument, or topics from being mentioned or raised in any evidence at trial – each considered separately – as set forth below.

## II.    GOVERNING LAW

The Due Process Clause requires the prosecution to prove beyond a reasonable doubt every element of the charged criminal offense. *See, In re Winship*, 397 U.S. 358, 364 (1970). The burden to prove or disprove an element of the offense may not be shifted to the defendant. See *id.*; see also *Patterson v. New York*, 432 U.S. 197, 215 (1977).

A motion *in limine* is one that acts as a "protective order against prejudicial questions and statements... and to avoid injection into trial of matters which are irrelevant, inadmissible and prejudicial. *See Redding v. Ferguson*, Tex.Civ.App. [1973], 501 S.W.2d 717, 724.

Rule 403 of the Federal Rules of Evidence provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice... confusion of the issues and misleading the jury." Although any evidence that is relevant and a "fact of consequence" to the action should be admitted, Rule 403 specifies that, "relevant evidence may be excluded if unfairly prejudicial." *See Huddleston v. United States*, 485 U.S. 681, 687 (1988). Evidence, arguments, and claims can result in prejudice against the Defendant, "if the jury thinks [their] acts are particularly repugnant", shocking, or offensive. *See United States v. Rogers*, 287 U.S. App. D.C. 1, 918 F.2d 207, 211 (1990). Evidence is "unfairly prejudicial" when it "tends to suggest a decision on an improper basis." *See United States v. Houston*, 813 F.3d 282, 291 (6th Cir. 2016). Evidence is also considered prejudicial if it "creates a risk that invites an irrational emotional response from the jury." *See United States v. Seals*, 813 F.3d 1038, 1043 (7th Cir. 2016).

Unfair prejudice, as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the fact finder into declaring guilt on a ground different from proof specific to the offense charged. *See Old Chief v. United States*, 519 U.S. 172, 180 (1997). The function of Rule 403 is to exclude only evidence of "scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." *See United States v. McRae*, 593 F.2d 700 at 707 (1979). The inquiry then rests upon, whether the undue prejudicial effect of the evidence substantially outweighs its probative value. Essentially, Rule 403 is meant to protect the Defendant by requiring that a judge evaluate the risks of harm that would result to the

Defendant (unfair prejudice, confusion, misleading) and to balance them against the probative

value of the evidence, taking into account, "the probable effectiveness or lack of effectiveness of

a limiting instruction." Fed. R. Evid. 403 advisory committee's note. *Id.* citing

E.Imwinkelried, *Uncharged Misconduct Evidence* §§ 8:23 to 8:28 (1990)).

> **Rule 403. Excluding Relevant Evidence for Prejudice,
> Confusion, Waste of Time, or Other Reasons**:
> The court may exclude relevant evidence if its probative value is
> substantially outweighed by a danger of one or more of the
> following: unfair prejudice, confusing the issues, misleading the
> jury, undue delay, wasting time, or needlessly presenting
> cumulative evidence.
> https://www.law.cornell.edu/rules/fre/rule_403

The standard in a criminal accused is that an accused is presumed innocent until proven

guilty beyond a reasonable doubt. "[T]hat there is a presumption of innocence in favor of the

accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the

foundation of the administration of our criminal law." *Coffin v. United States*, 156 U.S. 432, 453

(1895); *Estelle v. Williams*, 425 U.S. 501 (1976); *Kentucky v. Whorton*, 441 U.S. 786 (1979);

*Taylor v. Kentucky*, 436 U.S. 478 (1978). As such, the Due Process Clause requires the

prosecution to prove beyond a reasonable doubt every element of the charged criminal offense.

*In re Winship*, 397 U.S. 358, 364 (1970). Most importantly, the burden to prove or disprove an

element of the offense may never be shifted to the defendant. *Id; Patterson v. New York*, 432

U.S. 197, 215 (1977). Thus, no finding of "maybe" nor any conclusory argument can satisfy the

standard of "guilty beyond a reasonable doubt." Furthermore, a criminal defendant has the

constitutional right to confront (be confronted by) his accuser(s). One cannot constitutionally be

confronted with a "maybe" or a "could be."

Additionally, the Government cannot prove the guilt of an individual defendant by

suggesting that other people – not this Defendant – are guilty.  Absent proof of a (relevant and

material) conspiracy – which the Government has not attempted here – no person under the Due Process provisions of the U.S. Constitution may be accused or found guilty on the basis of guilt by association or merely being alive in the vicinity of someone else committing a crime.  Here, the DOJ relies upon things that "the crowd said" or that "someone said" or "someone did" as being equivalent to proving the guilt of a particular individual Defendant.

## III.    ARGUMENT AND INDIVIDUAL MOTIONS

### A.  EXCLUDE PHOTOGRAPH FROM GETTY AND UNKNOWN LIQUID

Dahlquist is charged with something he clearly did not do.  The prosecution depends upon a claim that he sprayed an unknown liquid randomly towards officers over the heads of protestors.

First, for all we know the allegedly sprayed liquid was a Mentos candy mint placed into a Pepsi-cola bottle.  Without proof beyond a reasonable doubt of what some liquid actually was the topic is not probative and is also prejudicial.  And any testimony or evidence would lack personal knowledge in violation of Rule 602 of the Federal Rules of Evidence.

Second, the allegation depends on photographs which do not show much of anything relevant, and the claim that Dahlquist sprayed some unknown substance must be excluded as not probative and highly prejudicial.

Third, the word "forcibly" in 18 U.S.C. 111 seems impossible for prosecutors or judges to recognize.  It's as if the reader is color blind and unable to see the word "forcibly."  The statute clearly does not punish any and all "physical contact" no matter how slight. The assertion that an action which must be done "forcibly" to qualify "does not require proof of violent force" is not a serious argument.

"There is no dispute that 'simple assault' is a crime 'committed by either **a *willful***

***attempt to inflict injury*** **upon the person of another**, or by a threat to inflict injury upon the person' . . .which, when coupled with an apparent present ability, causes a reasonable apprehension of immediate bodily harm." *U.S. v. Chestaro*, 197 F.3d 605 (2d Cir. 1999) (citing *United States v. Johnson*, 637 F.2d 1224, 1242 n. 26 (9th Cir. 1980)) *(emphasis added).*

In *Johnson v. United States*, 559 U.S. 133 (2010), the Supreme Court clarified that the force necessary to sustain the felony violent crimes in the U.S. Code must be substantial force. **"As we have discussed, however, the term "physical force" itself normally connotes force strong enough to constitute "power."** *Id*. "A crime that can be committed through mere recklessness does not have as an element the "use of physical force" because that phrase "has a well-understood meaning applying only to intentional acts **designed to cause harm.**" *Id*. *(emphases added).*

Therefore, no evidence of a non-forcible spraying of an unknown liquid can be probative of a crime that requires a test of "forcibly." The topic is irrelevant and prejudicial.

### B. IDENTIFICATION OF DEFENDANT DESPITE LACK OF PERSONAL KNOWLEDGE

The Statement of Facts supporting Dahlquist's arrest at ECF 1-1 makes clear that the affiant FBI agent has no personal knowledge of Frank Dahlquist. Therefore, the affiant cannot identify Dahlquist. The Statement of Facts may meet the very low suspicion for "probable cause" but the admissibility of the information, photographs, and video recordings must meet a higher standard at trial against the risk of being more prejudicial than probative, which is not a consideration for probable cause.

Presumably the photographs and video recordings relied upon will be some of the same evidence that the prosecution will introduce at trial.

The Statement of Facts attempts to compare photographs of two people neither of whom

5

he has any personal knowledge of or familiarity with.  Among other problems, this means that the affiant would be unavailable as a "competent" witness (as the law puts it with no disrespect intended) because he could not answer any questions in cross-examination.

1) In two photographs side by side on page 2, 3rd full paragraph, under "Facts Specific to the identification of DAHLQUIST, the affiant makes clear that he has no personal knowledge of any of the people shown in photographs.

2) Instead, the affiant explicitly relies upon surface similarities in appearance, but without any first-hand personal knowledge.  Out of a total estimated by the U.S. Capitol Police at 10,000 demonstrators on Capitol Hill that day, it is highly likely that similar-looking people will appear in photographs.

3) An attorney who defended Proud Boys member Zachary Rehl before Carmen Hernandez took over has discussed how he was certain that Zachary Rehl was videotaped at a trouble spot where events got heated and violent.  But then upon closer inspection, he realized that the clothing in the two different videos was subtly different.  Even though the person's head and face looked like Zachary Rehl, he was not Rehl.  Out of 10,000 people, two men both looked like Zachary Rehl.

4) In the first full paragraph of page 3, the affiant says "Both individuals share unique facial features."  Of course they are not unique.

5) In the first full paragraph of page 3, the affiant then asserts that a photograph depicts Frank Dahlquist after just revealing that he does not know Frank Dahlquist.

6) In the only paragraph of page 4, the affiant then asserts that a photograph depicts Frank Dahlquist after just revealing that he does not know Frank Dahlquist.

7) In the first full paragraph of page 6, the affiant recounts the claims of others

concerning "habit evidence" of Dahlquist wearing a piece of clothing.

8) In the third full paragraph of page 6, the affiant then asserts that a photograph depicts Frank Dahlquist after just revealing that he does not know Frank Dahlquist.

9) In the first photograph on page 6, the affiant then asserts that a photograph depicts Frank Dahlquist after just revealing that he does not know Frank Dahlquist.

10) In the second photograph on page 6, the affiant then asserts that a photograph depicts Frank Dahlquist after just revealing that he does not know Frank Dahlquist.

11) In the only paragraph of page 8, the affiant then asserts that a video recording depicts Frank Dahlquist after just revealing that he does not know Frank Dahlquist.

12) In the first full paragraph on page 9, the affiant then asserts that a video recording depicts Frank Dahlquist after just revealing that he does not know Frank Dahlquist.

13) Furthermore, in the first full paragraph on page 9, the affiant asserts that "soon thereafter" someone asserted to be Dahlquist is seen "at a different location." Therefore, the identification of Dahlquist is dubious because two people in two different locations are both asserted to be Dahlquist.

14) In the only paragraph of page 10, the affiant then asserts that a video recording depicts Frank Dahlquist after just revealing that he does not know Frank Dahlquist.

15) In the first photograph of page 11, the affiant then asserts that a video recording depicts Frank Dahlquist after just revealing that he does not know Frank Dahlquist.

16) In the second photograph of page 11, the affiant then asserts that a video recording depicts Frank Dahlquist after just revealing that he does not know Frank Dahlquist.

17) In the first full paragraph on page 12, the affiant then asserts that a video recording depicts Frank Dahlquist after just revealing that he does not know Frank Dahlquist.

18) In the first photograph of page 13, the affiant then asserts that a video recording depicts Frank Dahlquist after just revealing that he does not know Frank Dahlquist.

19) In the second photograph of page 13, the affiant then asserts that a video recording depicts Frank Dahlquist after just revealing that he does not know Frank Dahlquist.

20) In the only photograph of page 13, the affiant then asserts that a video recording depicts Frank Dahlquist after just revealing that he does not know Frank Dahlquist.

21) In the only photograph of page 14, the affiant then asserts that a video recording depicts Frank Dahlquist after just revealing that he does not know Frank Dahlquist.

22) In the only photograph of page 15, the affiant then asserts that a video recording depicts Frank Dahlquist after just revealing that he does not know Frank Dahlquist.

23) In the only photograph of page 16, and the first full paragraph, the affiant then asserts that a video recording depicts Frank Dahlquist after just revealing that he does not know Frank Dahlquist.

24) In the only photograph of page 17, the affiant then asserts that a video recording depicts Frank Dahlquist after just revealing that he does not know Frank Dahlquist.

25) In the only photograph of page 18, and the first full paragraph, the affiant then asserts that a video recording depicts Frank Dahlquist after just revealing that he does not know Frank Dahlquist.

26) In the only photograph of page 19, the affiant then asserts that a video recording depicts Frank Dahlquist after just revealing that he does not know Frank Dahlquist.

27) In the only photograph of page 20, the affiant then asserts that a video recording depicts Frank Dahlquist after just revealing that he does not know Frank Dahlquist.

## C.  PHOTOGRAPHS OF A MAN WEARING A COMMON SHIRT

In nearly all of the photographs, video recordings, and observations of the FBI agent affiant, the Government relies upon the fact that a man wearing a COVID-mask on January 6, 2021, and a "1776" sweat shirt or "black hoodie" must be Dahlquist.

On the contrary, that exact article of clothing is readily available for purchase by anyone, including on – but not limited to -- Amazon.com.  See:  https://www.amazon.com/Patriotic-USA-4th-July-Hoodie/dp/B07PVSS6CV/

Therefore, the mere fact that someone is wearing a commonly-available article of clothing does not make him Frank Dahlquist.  Any photograph or recording purporting to show or identify Frank Dahlquist should be excluded as more prejudicial than probative.

### D.  NORMAL "BURDEN" OF HUNDREDS OF VISITORS IN CAPITOL

On any given business day, the U.S. Capitol[1] is filled with hundreds if not a thousand or so visitors and tourists from around the world, school children on field trips, lobbyists, citizens seeking to meet with their representatives, journalists, and curious citizens simply watching their Congress at work.  Where the quantity of people in a 750 foot long building is not established as being different from a normal day on Capitol Hill, it should not be allowed as evidence.

On average by year, about 3 million people visit the United States Capitol building in Washington, D.C. each year. This includes U.S. and international tourists, school groups, and other visitors who come to see the iconic building and learn about its history.   Sean Salai, "D.C. sets new tourism records for visitors, revenue," The Washington Times, May 29, 2024 ("The District set new records with 25.95 million tourists and $10.2 billion in visitor revenue last year, the city's tourism bureau reported Wednesday."),

https://www.washingtontimes.com/news/2024/may/29/washington-dc-sets-new-tourism-records-

---

[1]       Keeping separate the term "Capital" meaning a city and "Capitol" meaning the building.

visitors-re/

### E. RECESS OF THE JOINT SESSION OF CONGRESS

Where a Defendant like Dahlquist arrived at the U.S. Capitol building around 3:06 PM EST, significantly after the Joint Session of Congress recessed on January 6, 2021, starting at about 2:13 PM according to the House Parliamentarian then Thomas Wickham, it is more prejudicial than probative to address any matters relating to the disruption or recess of the Joint Session of Congress on January 6, 2021. The Government admits that Dahlquist was not yet there when the decision to recess was made.

### F. RESUMPTION OF THE JOINT SESSION OF CONGRESS

No mention or evidence or argument should be permitted of any delay of the resumption of the Joint Session of Congress on January 6, 2021, which occurred around 8:06 PM EST, can be permitted. The Government's argument requires an expert opinion. Loose opinions that it takes time to screen the Capitol building for security are without merit. Where Dahlquist left Capitol Hill ***almost 4 hours before*** the Joint Session of Congress resumed, the Government would have to present an expert witness establishing step-by-step not only *what* had to be done, but *how long each step would take*. By that time of that day, hundreds of reinforcements of National Guard and police departments from around the region were flooding onto Capitol Hill, as dramatically as they were absent earlier in the day. Bomb-sniffing dogs, people-sniffing dogs, people-hearing dogs, and teams directed by a couple thousand security cameras able to look all over the Capitol and instruct searching teams where to look, would make the task quick and efficient.

Unless the Government can prove by how many seconds, minutes, or hours, Dahlquist's existence on Capitol Hill delayed the resumption, any mention of this topic is unfairly prejudicial

and not probative. Defendant realizes that the U.S. Supreme Court has thrown out charges under 18 U.S.C. 1512(c), yet Dahlquist is still charged with disruptive behavior and the prosecution typically spends about one-third of every criminal trial proving generalities and what a crowd did, which have no specific relevance to the individual Defendant before the Court.

### G. CERTIFICATION OF THE 2020 ELECTION

Despite the over-whelming group think and "the madness of crowds" there is no certification by Congress that takes place on any given January 6, such as January 6, 2021. This is significant because the invented narrative includes an attempt to make an event of simple mathematics (counting) into an adjudicatory proceeding. The Brett Kavanaugh confirmation hearings were physically disrupted by Leftist protestors entering and yelling in the middle of the Senate hearings in session; January 6 included no such actions. The Kavanaugh hearings had to result in a decision, January 6 did not.

Neither the Constitution nor the Electoral Count Act 3 U.S.C. 1 through 21 make any mention directly or in substance of Congress certifying anything. The Electoral College members meeting in each State certify *from the States* TO the Congress their votes. But Congress certifies nothing. The President of the Senate (by the ECA two tellers) opens and counts the Electoral College votes "in the presence of the" Members of Congress. There is no mention in the Congressional Record of calling the Members together for any certification. There is no mention in the Congressional Record of any conclusion certifying anything. There is nothing during the proceedings of any certification. The implication that there is some kind of adjudicatory proceeding by mis-using the term "certification" is false, deceitful, and misleading.

The Congressional Record for the Joint Session of Congress on January 6, 2021, do not identify the proceedings as a certification or as certifying anything. The conclusion reached do

not describe the conclusion as a certification or as certifying any result.

The Constitution and the Electoral Count Act do provide procedures for members of Congress to object to the Electoral College votes of individual States and challenge the legitimacy of the Electoral College votes from those States.  The riots by a very, very small number of the 10,000 demonstrators present on Capitol Hill on January 6, 2021, shut down these objections and ensured the inauguration of Joe Biden as President on January 20, 2021.

Disinformation that Congress "certifies" the election creates the false impression that there is some adjudicatory proceeding on January 6.  This is false.

## H. EXCLUDE FALSE AND INFLAMMATORY STATEMENTS ABOUT DEATHS THAT DID NOT OCCUR

The Government's advocacy exceeds the boundaries of merely being fallacious, groundless, and unfairly prejudicial.  On April 19, 2021, the U.S. Capitol Police issued a press release: https://www.uscp.gov/media-center/press-releases/medical-examiner-finds-uscp-officer-brian-sicknick-died-natural-causes

> **Medical Examiner Finds USCP Officer Brian Sicknick Died of Natural Causes**
>
> April 19, 2021  Press Release
> The USCP accepts the findings from the District of Columbia's Office of the Chief Medical Examiner that Officer Brian Sicknick died of natural causes. This does not change the fact Officer Sicknick died in the line of duty, courageously defending Congress and the Capitol.[2]
>
> The Department continues to mourn the loss of our beloved

---

[2]    Officer Sicknick apparently, as best as counsel who was not there understands, done his duty to the highest standards and is deserving of praise for his work and his efforts.  He did not, however, die as a result of any actions by any demonstrator or demonstrator-gone-wrong who rioted.  The attempt to lay the tragedy of a stroke upon any demonstrator or January 6 Defendant is as scurrilous as the Officer's death is a tragedy.  One had nothing to do with the other.  Let us hope and pray that medicine finds cures and improved treatments for the heartache of strokes.  If the wordsmanship ensures the best of benefits to his family, counsel and his clients welcome this.  But confusion to the jury here should be avoided.

> colleague. The attack on our officers, including Brian, was an attack on our democracy.
>
> Working with the U.S. Attorney's Office for the District of Columbia, the F.B.I.'s Washington Field Office and the Metropolitan Police Department, the USCP will continue to ensure those responsible for the assault against officers are held accountable.

* * *

Not only did the D.C. Coroner rule that Officer Sicknick died of natural causes, but the autopsy also found no physical injuries, no irritation by any chemical substance, nothing.

> [Chief Medical Examiner Francisco Diaz] told The Washington Post that the autopsy **found no evidence that Sicknick experienced an allergic reaction to chemical irritants. He also said there was no evidence of either external or internal injuries.**[3]

Pete Williams, "Capitol Police Officer Brian Sicknick died of natural causes after riot, medical examiner says," NBC News, April 19, 2021, https://www.nbcnews.com/politics/politics-news/capitol-police-officer-brian-sicknick-died-natural-causes-after-riot-n1264562 *(emphasis added).*

> Diaz's ruling means the chemical irritant assault – which two men, Julian Kahter and George Tanios, have been charged for – is not attributable for Sicknick's death, and may effectively prevent the Justice Department from bringing homicide charges in the case.[4]

Jordan Fischer, Eric Flack, "Officer Brian Sicknick died of natural causes, medical examiner says: The D.C. Office of the Chief Medical Examiner says chemical irritant exposure did not play a role in Sicknick's death, WUSA9 TV, April 19, 2021, https://www.wusa9.com/article/news/national/capitol-riots/officer-brian-sicknick-suffered-two-strokes-and-died-of-natural-cases-medical-examiner-says-capitol-riot-julian-khater-george-tanios/65-059aa393-621d-47a1-b4bc-3b01b204f3db

> Sicknick's manner of death was reported as natural. The cause was listed as "acute brainstem and cerebellar infarcts due to acute basilar artery thrombosis."

---

[3]    Officer Sicknick died of a stroke the day after January 6, 2021, and therefore the state of observable physical injuries would be static as of January 7, 2021.

[4]    Understanding legally that the chemical attack is alleged, the lack of any detectable effects upon Officer Sicknick could also suggest that Officer Sicknick was not in fact exposed to any chemical irritants, even if video evidence indicates an attempt. That is, Sicknick could be the victim of a chemical attack even though his attacker _missed_ hitting him.

The office, which released the report Monday, classifies a death as natural when "a disease alone causes death. ***If death is hastened by an injury, the manner of death is not considered natural.***"

Jordan Pascale, "D.C. Medical Examiner Rules Capitol Police Officer Brian Sicknick Had Two Strokes, Died Of Natural Causes," DCIST *[program of WAMU 88.5 of American University Radio]*, April 19, 2021, https://dcist.com/story/21/04/19/d-c-medical-examiner-rules-capitol-police-officer-brian-sicknick-had-two-strokes-died-of-natural-causes/ *(Emphasis added).*

Yet the Attorney General once again lied on January 4, 2023, that five police officers died on or as a ***direct*** result of events on January 6, 2021.  The Attorney General of course is not a random political appointee speaking politically.  He is ultimately responsible for all prosecutions at the federal level.  The Attorney General is in the chain of command, the top of the chain of command, of this case now before the Court.

https://www.justice.gov/opa/pr/attorney-general-merrick-b-garland-statement-second-anniversary-january-6-attack-capitol *(Emphases added):*

### Department of Justice
Office of Public Affairs

FOR IMMEDIATE RELEASE
Wednesday, January 4, 2023

**Attorney General Merrick B. Garland Statement on the Second**

**Anniversary of the January 6 Attack on the Capitol**

Friday, Jan. 6, 2023, will mark 24 months since the attack on the U.S. Capitol that disrupted a joint session of the U.S. Congress in the process of affirming the presidential election results.

Under the continued leadership of the Justice Department, the U.S. Attorney's Office for the District of Columbia and the FBI's Washington Field Office, the investigation and prosecution of those responsible for the attack continues to move forward at an unprecedented speed and scale.

Attorney General Merrick B. Garland made the following statement:

"Two years ago, the United States Capitol was attacked as lawmakers met to affirm the results of a presidential election. Perpetrators attacked police officers, targeted and assaulted

members of the media, and interfered with a fundamental element of our democracy: the peaceful transfer of power from one administration to the next.

"Since then, countless agents, investigators, prosecutors, analysts, and others across the Justice Department have participated in one of the largest, most complex, and most resource-intensive investigations in our history. I am extremely grateful for the dedication, professionalism, and integrity with which they have done this work. This investigation has resulted in the arrest of more than 950 Defendant for their alleged roles in the attack. We have secured convictions for a wide range of criminal conduct on January 6 as well as in the days and weeks leading up to the attack. Our work is far from over.

"We will never forget the sacrifice of the law enforcement officers who defended the members of Congress and others inside the Capitol that day. ***And we will never forget the five officers who responded selflessly on January 6 and who have since lost their lives: Officer Brian Sicknick, Officer Howard Liebengood, Officer Jeffrey Smith, Officer Gunther Hashida, and Officer Kyle DeFreytag.***

"The Justice Department remains committed to honoring them. We remain committed to ensuring accountability for those criminally responsible for the January 6 assault on our democracy. And we remain committed to doing everything in our power to prevent this from ever happening again."

***

Without waiting for the facts, the U.S. Department began this false narrative, in a January 8, 2021, press release: "**Statement of Acting Attorney General Jeffrey A. Rosen on the Death of U.S. Capitol Police Officer Brian D. Sicknick**,"

https://www.justice.gov/opa/pr/statement-acting-attorney-general-jeffrey-rosen-death-us-capitol-police-officer-brian-d  The DoJ 88 days *before* the D.C. Chief Medical Examiner determined Sicknick's cause of death – had already leaped to an unfounded conclusion.

Meanwhile, there were four suicides of law enforcement officers after January 6, 2021 -- Officer Howard Liebengood, Officer Jeffrey Smith, Officer Gunther Hashida, and Officer Kyle

DeFreytag.

However, there is no evidence of any connection between these suicides and any event on or related to January 6, 2021.  This is a recognized logical fallacy called "Post hoc, ergo propter hoc" or "After this, therefore because of this."  This is also referred to as a Post hoc logical fallacy.  Specifically, "assuming that since A happened before B, A must have caused B."

The fact that January 6 2021, occurred and then the suicides occurred does not support any causal relationship between one and the other.

Sadly, suicides happen far too often.  Trying to understand why one has made that decision is often one of many very difficult issues when it happens.  Yet completely inventing imaginative reasons in order to try to convict someone else not responsible is no better.   A suicide is a tragedy.  Trying to exploit someone's suicide for partisan gain is despicable.

## I.  CONJECTURE OR SPECULATION

The Government should be excluded from making argument about, making reference to, presenting on or introducing evidence of any element of a crime based upon the Government's conjecture rather than solid, admissible evidence that this Defendant in fact is guilty of each element of a crime beyond a reasonable doubt.   The Government accuses the Defendant of "disorderly and disruptive conduct in a Restricted Building," but not has alleged any individual actions by Defendant that amount to disorderly and disruptive conduct when the Government has alleged no facts of any such crime. The Government also accuses that Defendant of "violent entry and disorderly conduct in a Capitol Building," but the Government has alleged no facts of any such crime.

## J.  GUILT BY ASSOCIATION

The Government should be excluded from making arguments about, making reference to,

presenting on or introducing evidence of any element of a crime based upon the guilt of other people, not these Defendant, as an argument of guilt by association, or the Defendant being in the vicinity of a crime, or merely existing near where a crime occurred. The Defendant cannot be guilty merely because other people are guilty, even though nearby.

K. **GUILTY CROWDS OR COLLECTIVE GUILT**

The Government's approach to all January 6 related prosecutions has been to drastically depart from established criminal law and focus on what the crowd said, the crowd felt, or the crowd did.   The Government seems determined to establish a whole new type of collectivist law foreign to these shores, in which the Defendant is guilty of what other people did.

The prosecution must prove the individual guilt of each Defendant.  This Defendant may not be convicted based upon "context" or collectivist liability.   To the contrary, it was argued in one January 6 case:

> The following metaphor is helpful in expressing what the statute does require. Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field. The same idea applies in these circumstances. Many rioters collectively disrupted Congressional proceedings, and each individual rioter contributed to that disruption. Because Rivera's presence and conduct in part caused the continued interruption to Congressional proceedings, the Court concludes that Rivera in fact impeded or disrupted the orderly conduct of Government business or official functions.

This bears no resemblance to the laws of the United States of America and must be rejected strongly or our nation is lost.  The Court is asked to notice that there is no conspiracy alleged on these matters, which might be different.  Unrelated people are not "raindrops."

 "It is well-established that the determination of probable cause must be an individualized matter." *Carr v. District of Columbia*, 565 F. Supp. 2d 94, 99 (D.C. Cir. 2009). See also *Barham*

*v. Ramsey*, 434 F.3d 565, 573 (D.C. Cir. 2006). "Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person. This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another ...." *Ybarra v. Illinois*, 444 U.S. 85, 91, 100 (1979). "To demonstrate that plaintiffs' arrests were valid, therefore, the District must show that it had probable cause to arrest each individual . . ." *Carr*, 565 F. Supp. 2d at 99.

**"The fact that rioting is a group offense does not eliminate the constitutional requirement of particularized suspicion of guilt."** *Id. (emphasis added).*

This is true even if the "mob" has a generalized characterization of criminal behavior. *Carr*, supra, at 99. Thus, even if a "mob" that Mr. Rivera was in the proximity of engaged in violent and destructive behavior, Mr. Rivera cannot be prosecuted merely for associating with them. See *Washington Mobilization Committee v. Cullinane*, 566 F.2d 107 (D.C. Cir. 1977); *Dellums v. Powell*, 566 F.2d 167 (D.C. Cir. 1977); *Barham v. Ramsey*, 434 F.3d 565 (D.C. Cir. 2006); *Carr*, at 101.

> This is where things fall apart. Although both Governor DeSantis and Sheriff Williams argue that the phrase "willfully participate" is commonly understood, neither party offers an actual definition. Is it enough to stand passively near violence? What if you continue protesting when violence erupts? What if that protest merely involves standing with a sign while others fight around you? Does it depend on whether your sign expresses a message that is pro- or anti-law enforcement? What about filming the violence? What if you are in the process of leaving the disturbance and give a rioter a bottle of water to wash tear gas from their eyes?
>
> The Governor would have this Court pencil in an exception for a person who merely "attend[s]" a violent demonstration but does not actively engage in violence or conduct that poses an imminent risk of injury or property damage. ECF No. 99 at 13. But the Governor offers no explanation or construction that limits when mere attendance becomes participation, except that a person must "intend to commit violence." Id. But this ignores the plain text of the statute, which separates a person from an assembly of three or more persons sharing that intent. See *infra.*

*See, The Dream Defenders, et al., v. Ron DeSantis, 21-cv-191, ECF No. 137 (N.D. Fla. Sept. 9, 2021), (Mark E. Walker, Chief United States District Judge),* Page 53 *(injunction against anti-riot law in part because the legislation appeared to criminalize the defendant's protest activities even if he did not participate in the violent acts of others.* And continuing:

> If this Court does not enjoin the statute's enforcement, ***the lawless actions of a few rogue individuals could effectively criminalize the protected speech of hundreds, if not thousands, of law-abiding Floridians***. This violates the First Amendment. See, e.g., *Bible Believers v. Wayne Cnty.*, Mich., 805 F.3d 228, 252 (6th Cir. 2015). Florida's interest in preventing public violence is beyond question, but when that interest collides with rights guaranteed by the First Amendment, the "government may regulate in the area only with narrow specificity." *Button*, 371 U.S. at 433. Otherwise, those rights, which "are delicate and vulnerable, as well as supremely precious in our society," may be suffocated. Id. Section 870.01(2), through its ambiguity, chills speech and eviscerates that essential breathing space. The law is overbroad.[27]

> Accordingly, I conclude that Plaintiffs have established a substantial likelihood of success on the merits as to their overbreadth claim.

*Id.,* at Page 77 *(emphases added).*

Collectivist punishment is not permitted nor constitutional within U.S. criminal law.

With rare exceptions inapplicable here (such as hiring someone to commit a criminal act), no

person under the U.S. Constitution may be convicted or sentenced for what other people did.

## L. SPECIFICALLY EXCLUDE CROWD GUILT

Specifically, in the Statement of Facts in support of the arrest warrant at ECF 1-1, the

Government relies upon the collectivist guilt of "the crowd" rather than the individual guilt

proven beyond a reasonable doubt of the individual Defendant Dahlquist on trial.

1) In the 3rd paragraph, page 1, "Background"

2) In the 4th paragraph, page 1, "Background"

## M. ANY VIDEO IN WHICH THE DEFENDANT DOES NOT APPEAR

No video recording or photograph which does not show the Defendant should be

admitted or referred to.  The Government has systematically sought to knowingly inflame the emotions of juries by claiming it needs to show the "context" even though the "evidence" has no probative value of any kind.  Certainly, videos and photographs that are more prejudicial than probative must be excluded.  Simply reciting the generic hypothetical possibility that evidence which has nothing to do with the actual Defendant might assist the jury to come to a law-based, fact-based, rational verdict does not make it so.  The hypothetical possibility is an insufficient argument.  The vast majority of the Government's "evidence" in fact has no probative value of any kind relevant to this particular Defendant, much less to overcome the risk of unfair and undue prejudice.

## N. **"GUILTY WATCHING" IS NOT A CRIME**

Misunderstanding a decision by the Honorable Trevor McFadden on April 6, 2022, *United States v. Matthew Martin,* Case No. 1:21-cr-00394, the Government has become fixated on what might be called "Guilty Watching" or "Guilty Viewing."  But seeing other people commit a crime does not make one guilty of that crime.  One can attend a sports event, see a group of beered-up attendees brawling near the concession stands, and expect that law enforcement will take care of it, particularly when officers are visible.  The viewing attendees are perfectly free to continue to enjoy the sports event regardless of the transgressions of others.  Hearing a fire alarm going off could merely indicate a prank or attempt by someone (else) to disrupt the proceedings.  Seeing someone break a window means nothing more than that person is guilty of breaking a window, while the Defendant is not guilty of that.


## O. **EXPRESSIONS OF FREE SPEECH**

While the statutes focus on "loud" or "disruptive" speech (i.e., yelling), many January 6

Defendants have been charged for speaking in a barely audible voice or broadcasting reports by social media to persons not in the District of Columbia.  Listeners hearing reports across the country  could not be disruptive to those inside the Capitol.  Such references must be excluded.

Similarly, January 6 Defendants saying things that prosecutors do not like on days *after* January 6, 2021, *after* returning home from the District of Columbia to another State, cannot be disruptive speech inside the Capitol, when spoken days later.  These are not statements that form any part of planning or implementing any crime, again days later.  "Celebrating" what other people did may offend tightly-wound Government bureaucrats, but "celebrating" is protected speech under the First Amendment.  Knowledge of the counting procedure (there is no certification) of Electoral College votes is not a crime, but good civics education.

Prosecutors and judges have confused what is being argued and why the First Amendment immunizes most January 6 Defendants from being prosecuted for "Wrong Think."[5]

Misunderstanding the question, judges and prosecutors have proclaimed the principle that what is a crime is not immunized by the First Amendment.  This is of course completely irrelevant and totally disconnected from what anyone is arguing.

### *What is not a crime does not become a crime because of what a person believes.*

Notice how this juror explains to a reporter that January 6 Defendants are guilty because of what the Defendants believe:  "J6 Juror Speaks Immediately After Guilty Verdict Sounds Like Every J6 Juror,"  https://rumble.com/v61xt65-j6-juror-speaks-immediately-after-guilty-verdict-sounds-like-every-j6-juror.html

The issue has never been that an actual crime cannot be prosecuted because of the exercise of First Amendment rights.  If a person robs a bank while reciting the speech of Richard III about the battle on St. Crispen's Day or reciting a speech on the political demands of the

---

[5]      1984, by George Orwell

Revolutionary Armed Forces of Colombia (Farc, after the initials in Spanish), they still robbed the bank. It does not matter why they robbed the bank. If competent evidence showed they did it, then they can be prosecuted for bank robbery, while speechifying or not.

But what no prosecutor or judge can ever do is what is happening regarding January 6 Defendants: Prosecute people *for what they believe*. In almost every January 6 related trial, the prosecution has knowingly and intentionally spent about a third of the trial putting on argument and evidence that the Defendant(s) believe things different from what the D.C. jury believes. Prosecutors knowingly seek to convict Defendants for being "the other" – not one of us.

Nothing in the U.S. Constitution allows the prosecution of anyone for being wrong in their political beliefs. (It is popularly, but incorrectly, argued that one cannot yell fire in a crowded theater. But, actually, they can. This is especially true where one honestly believes there to be a fire. If there actually were a fire backstage and a stage hand rushed out in front of the curtain and warned the audience, she would be a hero for helping save lives. In a stage production of MacBeth, in the scene of three witches on a deserted road, if a stage handler over-did a smoke machine and filled the stage with smoke, an audience member might honestly believe that the excessive amount of smoke is caused by a fire. He might be wrong, but still insulated by the First Amendment in crying "fire!")

America was founded and exists on the "Counter Speech Doctrine." Justice Louis D. Brandeis established it in his classic concurring opinion in *Whitney v. California* (1927), when he wrote:

> "If there be time to expose through discussion, the falsehoods and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence."

*Id.*

> Under the First Amendment, there is no such thing as a false idea.
> However pernicious an opinion may seem, we depend for its correction
> not on the conscience of judges and juries but on the competition of
> other ideas").

*Gertz v. Robert Welch, Inc.,* 418 U. S. 323, 418 U. S. 339-340 (1974) (concurring opinion / dissent).

It is anti-American and an affront to human rights to censor opinions or criticisms rather than to answer them with robust, reasoned, and effective debate.  Justice Anthony Kennedy cited Justice Brandeis' famous principle in his plurality opinion in United States v. Alvarez (2012) and his dissenting opinion in *Williams-Yulee v. Florida Bar* (2015).   In *Alvarez*, the Court struck down the constitutionality of the Stolen Valor Act, a law that broadly prohibited virtually any false speech about military honors.

> "The remedy for speech that is false is speech that is true."

Kennedy wrote.

> "This is the ordinary course in a free society. The response to the
> unreasoned is the rational; to the uninformed, the enlightened; to the
> straight-out lie, the simple truth."

*Id.*

It is unconstitutional to punish a person for his or her expressions of free speech guaranteed as rights under the First Amendment, except within the narrow and strict test

*Brandenburg v. Ohio*, 395 U.S. 444, 448 (1969).

> [T]he constitutional guarantees of free speech and free press do not
> permit a State to forbid or proscribe advocacy of the use of force or of
> law violation except where such advocacy is directed to inciting or
> producing imminent lawless action and is likely to incite or produce such
> action.  * * * A statute which fails to draw this distinction impermissibly
> intrudes upon the freedoms guaranteed by the First and Fourteenth
> Amendments."

*See also NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982) and *Hustler Magazine v. Falwell,* 485 U.S. 46 (1988) ("The fact that society may find speech offensive is not a sufficient

reason for suppressing it" – Chief Justice William Rehnquist"), under 18 U.S.C. 241.

> If the line drawn by the decree between the permitted and prohibited activities of the NAACP, its members and lawyers is an ambiguous one, we will not presume that the statute curtails constitutionally protected activity as little as possible. For standards of permissible statutory vagueness are strict in the area of free expression. See *Smith* v. *California*, 361 U.S. 147, 151; *Winters* v. *New York*, 333 U.S. 507, 509-510, 517-518; *Herndon* v. *Lowry*, 301 U.S. 242; *Stromberg* v. *California*, 283 U.S. 359; *United States* v. *C.I.O.*, 335 U.S. 106, 142 (Rutledge, J., concurring). *N.A.A.C.P.* at 432.

*N.A.A.C.P. v. Button*, 371 U.S. 415, 83 S. Ct. 328 (1963).

> *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982) explains (emphasis added):

> The boycott of white merchants in Claiborne County, Miss., that gave rise to this litigation had such a character; ___**it included elements of criminality and elements of majesty.**___
> > * * *
> The Mississippi Supreme Court quoted from the trial court:

> In carrying out the agreement and design, certain of the defendants, acting for all others, engaged in acts of physical force and violence against the persons and property of certain customers and prospective customers. Intimidation, threats, social ostracism, vilification, and traduction were some of the devices used by the defendants to achieve the desired results.
> > * * *
> This U.S. Supreme Court decided that:

> * * *  As we so recently acknowledged in Citizens Against Rent Control/Coalition for Fair Housing v. Berkeley, 454 U. S. 290, 454 U. S. 294,
> > "the practice of persons sharing common views banding together to achieve a common end is deeply embedded in the American political process."

> The Supreme Court concluded:

> The right to associate does not lose all constitutional protection merely because some members of the group may have participated in conduct or advocated doctrine that itself is not protected.

## IV.    CONCLUSION

The Government bears the burden of proof beyond a reasonable doubt always at all times in every aspect and detail of a criminal prosecution.  The burden of proof never shifts.  The Court should exclude any argument, mention, unqualified "evidence" or discussion of the foregoing topics, each considered independently, on the grounds that each topic is either not probative at all or more prejudicial and/or confusing than their minor probative value.  Many of the topics sought to be excluded have no rational relationship of any kind to guilt of the Defendant Dahlquist.  Others are improper appeals to lawless jury deliberations and/or verdicts through emotion, encouraging logical mistakes, and/or confusing the jury, often intentionally.  At a minimum, the Court should restrain any of those matters being heard by the jury unless or until carefully decided outside the hearing of the jury to the Court's informed discretion.

December 24, 2024                          **RESPECTFULLY SUBMITED,**
                                           *Counsel for Defendant*

                                           /s/ Brad Geyer
                                           Bradford L. Geyer, PHV
                                           NJ 022751991
                                           Suite 141 Route 130 S.  303
                                           Cinnaminson, NJ 08077
                                           Brad@FormerFedsGroup.Com
                                           (856) 607-5708

## **CERTIFICATE OF SERVICE**

I hereby certify that on this date my law firm is filing the foregoing with the Court by its ECF record-keeping and filing system, which automatically provides a copy to:

MATTHEW M. GRAVES
UNITED STATES ATTORNEY, by:

Sean Brennan
DOJ-USAO
Criminal Division - Capitol Siege Section
601 D St NW
Washington, DC 20579
202-252-7125
sean.brennan@usdoj.gov

Benet Kearney
U.S. ATTORNEY'S OFFICE
26 Federal Plaza
New York, NY 10278
212-637-2260
benet.kearney@usdoj.gov

David Perri
USAO
LRM: Weaver, Tracie
Federal Building United States Courthouse
1125 Chapline Street, Suite 3000
Wheeling, WV 26003
304-234-0100
304-234-0111 (fax)
david.perri@usdoj.gov

Karen E. Rochlin
DOJ-USAO
99 Northeast 4th Street
Miami, FL 33132
305-961-9234
karen.rochlin@usdoj.gov

/s/ Brad Geyer
Bradford L. Geyer, PHV