**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES,**<br>                    **Complainant,**<br><br>         v.<br><br>**FRANK DAHLQUIST,**<br><br>                    **Defendant.** | Case No. **24-cr-00443**-BAH |

**RESPONSES OF DEFENDANT FRANK DAHLQUIST**
**TO COMPLAINANT UNITED STATES' OMNIBUS MOTION(S) IN LIMINE**

Defendant Frank Dahlquist, by and through counsel, hereby files this motion to dismiss Counts II and III of the superseding indictment which allege violations of 18 U.S.C. § 111, pursuant to Rule 12 of the Federal Rules of Criminal Procedure.

## I.    INTRODUCTION AND PROCEDURAL POSTURE

The Government filed its "UNITED STATES' OMNIBUS MOTIONS IN LIMINE" on December 2, 2024. The substitute and current counsel Brad Geyer was entered into the case *pro hac vice* on December 16, 2024. Substitute counsel appreciates the reminder of the Court that this omnibus motion (functionally several motions in limine) were pending and apologizes for the late response.

The undersigned counsel Geyer is not certain if by email or otherwise there was discussion between prior counsel and the Government about the pending motions. Prior counsel is highly capable but also taxed with many cases. Defendant Dahlquist, by current counsel, does not oppose one of the items / motions in limine and agrees upon careful clarification and

limitation a couple of others. Dahlquist by counsel believes there is little fundamental disagreement on those but that differences in the way the parties are expressing concepts may lead to confusion if not clarified now.

## II.    NOTE ON FORMATTING OF DEFENDANT'S RESPONSE

The Government combined a number of different topics of motions in limine its "UNITED STATES' OMNIBUS MOTIONS IN LIMINE." This is fine of course. But the different topics for requested orders in limine are not merely specific aspects of one common theme. They involve several different entire themes unto themselves. Therefore, counsel feels it will be more clear to respond to each of the topics separately as if they are different motions in the content below. It is hoped that this formatting will allow each topic to be carefully considered as independent topics.

## III.    FACTUAL BACKGROUND

Defendant Dahlquist has some concern about presuming that the Court "knows" facts not yet in evidence in this case. Rarely in U.S. legal history has an event been prosecuted in such large numbers, often involving minor participants. Normally, prosecutions have focused on organizers and leaders. As a result, the U.S. District Court of the District of Columbia has more than 1500 defendants, approaching 1600 over time, which are sometimes treated like one single giant case but at other times treated like independent cases. The constant in this seems to be however the prosecution can seek the greatest advantage.

Therefore, technically, even after hearing perhaps hundreds of related cases, a judge should approach this and every case "knowing" only what is presented in admissible evidence in that case. Really, whether one prefers it or not, if prosecutors proved all facts necessary to

convict in Case #100 but leaves out crucial facts in Case # 101, the proof from one case cannot be shifted over to another case. This might be different if all January 6 related cases were consolidated as one single giant case.

Counsel for Dahlquist is certain that many of the facts about events on January 6, 2021, at and around the U.S. Capitol (colloquially "Capitol Hill") as pushed by the Government are in fact untrue. For example, the Government claims facts about the "riot." The Capitol building is 750 feet long, the length of some small ocean-going cruise ships. There are many entrances. It may fairly be opined that at a couple of entrances riots occurred, whereas no riots occurred elsewhere around the 750-foot long building. Therefore, whether a particular defendant had anything to do with a riot is case-specific depending on the facts of a particular Defendant's case.

Estimates given publicly by the U.S. Capitol Police vary ("vaguely referring to thousands") but are stated as many as 10,000 people who were on Capitol Hill on January 6, 2021. It is indeed quite a stretch to generalize anything about 10,000 individual people.

Because the circumstances were fluid, Dahlquist rejects the common fuzziness of "at that time" leaving us to wonder "what time?" Dahlquist will prove the truth to be different from what the prosecution wishes were true.

The omnibus motion's "Factual Background" further states "While standing at least one row of rioters back from the police line, Dahlquist lifted his hand above the crowd and sprayed an orange-colored chemical irritant directly into the face of USCP Officer M.W."

In fact, there is no competent evidence of this, certainly not of any "chemical irritant," and the parties are sharply in dispute about what the Motions present as "fact." The Government depends upon a photograph from the private news company "Getty" and its subdivision "Getty Images" which has already been altered once to impose the "Getty Images" logo. The only

image of a spray of something unknown which is claimed to be orange occurs when the man being identified as Dahlquist's fingers are not on any trigger or bottle being squeezed.

The "Factual Background" section also asserts that "At the time, Dahlquist was wearing a gray bandana over the lower half of his face as a mask."  But whether the man photographed is Dahlquist or not is a factual question for trial.

The "Factual Background" section also asserts that "After being sprayed by Dahlquist, Officer M.W. turned away from the police line to seek medical attention."  However, a person's action out of an abundant of caution from some unknown spray is not probative evidence.

The "Factual Background" section also asserts that "Later, at approximately 2:27 p.m., rioters began to break through the police line on the West Plaza."  However, the video record clearly shows that a few minutes before that police officers fired huge quantities of gas into the wind which then blew back upon them, with officers commenting on audio that they had gassed themselves.  And only after the officers then abandoned the Lower West Plaza at around 2:24 p.m. did demonstrators move up on the West Plaza.  https://open.ink/collections/j6

## IV.    MOTION IN LIMINE TO LIMIT UNNECESSARY DISCUSSION OF SECURITY-RELATED TOPICS

In every or almost every January 6, 2021, related trial, the Government has filed this motion in limine, and then nearly always exceeded themselves the boundaries they argue.

### A.  CCTV CAMERAS

Concerning "the exact locations of USCP CCTV cameras" counsel is not aware, despite extensive networking, of any January 6 Defendant who has been remotely interested in "the exact locations of USCP CCTV cameras."

First of all, it is overwhelmingly obvious from the views of the videos where the cameras are.  Any amateur – at any location, not specific to any particular government building -- can look at a video and figure out where the camera was viewing that scene.  That is simply the nature of video.  Second, as the Government says the locations of the cameras "have little to no probative value" of anything in these cases, unless perhaps – as has not come up to counsel's awareness – there were a dispute about the quality and accuracy of a video recording not accurately showing what it purports to show.  Third, disclosure of these would certainly not "compromise significant security interests if needlessly disclosed to the public."  Any suggestion that the security systems used in the Capitol are somehow unique is unwarranted. And the only way that the locations of cameras would have any detrimental consequence is ***if there are not enough cameras – leading to blind spots.***  But it has been publicly discussed that 44,000 hours of video have been collected concerning January 6 and there have been 9 to 10 terabytes of data provided in prosecution disclosures.  It would be illogical for anyone to assume that any blind spots or inadequacies exist.

However, if there were any blind spots in the Capitol's security network, the solution would be to ***buy more cameras.***  Surely the amount of attorney and prosecutorial time spent on worrying about – hypothetically – some (highly unlikely) blind spots being disclosed would (in today's technological marketplace) easily pay for more cameras.  The Capitol's security would best be promoted by a public perception something like "Don't try anything, we've got cameras watching your every move" than fighting over secrecy about camera locations.

Yet even though no one is asking, the Government has filed this motion in apparently every single January 6 criminal prosecution.[1]

**B. SECRET SERVICE PROTOCOLS**

The Motion in Limine also asks to exclude "unnecessary" disclosure to the public of "the protocols of the U.S. Secret Service ("USSS" or "Secret Service")"

Unfortunately, this depends on exactly what that means.

Pages 9 and 10 of the Motion in Limine swallow up the asserted goal. If we exclude everything except what is stated on those pages, we are actually not excluding anything at all. At least not anything that anyone would care about. (Counsel can imagine that the Government is imagining the rare but real intentional, unnecessary harassment that has sometimes occurred in trials. We trust that that is not professional behavior.)

But despite asking for and getting this same Motion in Limine in most cases, the prosecution itself has usually gone far beyond the lines that it seeks to draw when calling officers of the U.S. Secret Service. Officers like Capitol Liaison Glavey were often asked by prosecutors on direct much more searching questions than defense counsel would expect to be necessary.

The Motion in Limine including its Factual Background concede that the Government must prove that there was a restricted building and/or grounds pursuant to 18 U.S.C. 1752. But of course there was not. The Secret Service would need to testify that the Secret Service (not someone else) declared restrictions of the Capitol building and a very small sliver of the grounds hugging the South, North, and East faces and a larger section of the West grounds.

---

[1]    Again, Counsel does appreciate that there are (fortunately very rare) examples of abusive trial tactics like the defense attorney who attacks a crime victim on the stand. But counsel believes such urban legends to be unlikely to occur in any of these cases.

The Secret Service would need to testify that the Secret Service used its expertise to shape and design those restrictions. Recall that the Vice President has a regular, standing, official office in the Senate side of the U.S. Capitol and is frequently working or serving in the U.S. Capitol as the President of the Senate. His family could drop by with him at any time. And yet these regular, routine visits do not trigger restrictions being declared.

Although the U.S. Supreme Court has returned 18 U.S.C. 1512(c) to its pre-January 6 interpretation, the Defendant is still charged under 40 U.S.C. 5104 with disruption of Congressional business which began to recess at 2:13 PM through time-travel in violation of the Temporal Accords by entering the Capitol at 3:06 PM. By some act of wizadry, Dahlquist at 3:06 PM caused something to happen at 2:13 PM EST.

What the Secret Service officially discerned as a threat to Secret Service protectees (such as reports of pipe bombs in the area), when the decision was made to recommend a recess, and why are core parts of the Government's case.

Defendant agrees that Defendant's counsel will not inquire into "(1) Secret Service protocols related to the locations where protectees or their motorcades are taken at the Capitol or other government buildings when emergencies occur," except to the extent that the Government makes the presence of a Secret Service protectee in the U.S. Capitol at a particular point in time a relevant part of the Government's prosecution case.

For since the Parliamentarian of the House Thomas Wickham testified on October 19, 2021, in *United States v. Stewart Rhodes* that Speaker Nancy Pelosi was whisked away by security at 2:13 PM EST, then at 3:06 PM it is unlikely that any Secret Service protectee was still in the Capitol Building when Dahlquist entered at 3:06 PM.

7

Defendant cannot foresee any scenario for discussion of "(2) details about the nature of Secret Service protective details, such as the number and type of agents the Secret Service assigns to protectees," except perhaps to merely identify who makes the decisions to establish a restricted area and who makes the decision to relocate a protectee for the purpose of determining what happened. Counsel would restrain general curiosity to private entertainment viewing at home of shows like "24."

### C.  MOTIONS IN LIMINE TO ADMIT THE CONGRESSIONAL RECORD AND S. CON. RES 1

Defendant by counsel has no objection to admission into the trial record the Congressional Record from January 6, 2021. Defendant would agree and ask for it to be included in the evidence. It appears that there were some proceedings reported earlier in the day before the Joint Session of Congress convened at about 1:00 PM EST (a few minutes late we're told). However, Rule 106 of the Federal Rules of Evidence requires that the entire report concerning the Joint Session of Congress and the counting of the Electoral College votes be admitted together. Also, Defendant does not agree to any characterization but would have the document speak for itself. There are many who find it impossible to believe that substantive discussions did not take place between 2:29 PM and 8:00 PM EST that should have also been recorded, and believe that the Congressional Record might not capture everything that happened as official business of the Joint Session of Congress. Notably, many Members of Congress who had filed objections withdrew those objections after 8:09 PM. It should be sufficient to simply let the document speak for itself. It is insisted by some observers that debate and decisions were made off the House and Senate floors. So it would be best not to characterize the Congressional Record from that day as anything broader than what it says and claims to be.

### D.  MOTIONS IN LIMINE TO PRECLUDE IMPROPER DEFENSE ARGUMENTS

**1.** <u>Entrapment-by-Estoppel or Public Authority Defenses</u>

The Government defines this issue as something totally unrelated to anything that most defense counsel are arguing.  The Motion in Limine states "As courts in this district have explained, the entrapment-by-estoppel and public authority defenses are closely related and derive from a constitutional prohibition against "convicting a citizen for exercising a privilege which the State had clearly told him was available to him." *United States v. Sheppard*, No. 21-cr-203, 2022 WL 17978837 at *7 (D.D.C. Dec. 28, 2022) (J. Bates) (quoting Cox v. Louisiana, 379 U.S. 559, 571 (1965)).

From here, the topic goes off the rails. 18 U.S.C. 1752 for example only applies to those who enter or remain in a restricted area "without authorization." But the Government wants to suggest that a public official cannot transform what is illegal into legal. Where the illegality *depends upon* whether a public official grants permission or not then *of course* whether an act is legal or not turns on that public official's actions or apparent actions. Conduct which is *not illegal* remains *not illegal*. When a person is "authorized" to enter a restricted buildings or grounds, his entering or remaining *is legal*.  It does not need to be changed.  It is already legal. The U.S. Capitol Police are hired, set up, and stationed for that very purpose.  If someone asks "Can I go in and use the bathroom?" even though an area is otherwise

restricted, and the U.S. Capitol Police officer at the door says "Sure.  Make it quick." then the person's entrance is _legal_.


Suppose a New Year's Eve traffic blockade requires every car to stop while the driver is checked for intoxication by a police officer.  The officer says "You're free to go."  **_LEGAL_**  The driver runs through the barricade without stopping.  **_NOT LEGAL_**.  Beyond all doubt that order that a driver stop contrasted with permission to drive on _changes_ the conduct between legal or not legal.  Of course a public official can determine the difference between legal and illegal conduct. Again, whether the conduct is legal or illegal is _determined_ by the public official's explicit or possibly "apparent" or implied decision. Yet the Government throws fluff at us. Why?  Because the statutes themselves specify that the public official has that authority to give permission or withhold permission.  The prosecution relies upon generic situations that are not applicable here. This is not because something illegal has been transformed.  It is because the statute is conditioned on "without authorization."  A person given authorization can _never_ be guilty of entering "without authorization." Furthermore, because the statute is also conditioned upon "knowingly" a person who reasonably believes that he has been authorized cannot be guilty of "knowingly" entering without authorization.  Again, this is not because the nature of the crime has been changed.  It is because that statute itself constrains its own application.

Put frankly, no court has any jurisdiction to convict anyone for "unknowingly" entering a restricted area "without authorization" or "knowingly"

entering a restricted area "with authorization." The statute as passed by Congress does not grant the Court the power to enforce the law outside of its terms.

Consider:  The Captain of a U.S. nuclear-powered ballistic missile submarine meets an attractive woman at a bar near the port and invites her back to the submarine for a tour of his submarine.  Perhaps he is mostly intoxicated by alcohol as much as being otherwise intoxicated.  The Captain gives the civilian woman a tour.  When the Captain is swiftly court-martialed, the Captain may be guilty.  ***The civilian is not***.  It would be improper even illegal for a submarine captain to show the submarine to a civilian.  But the civilian has committed no wrong. She was invited in for a tour.

But the Government wants to argue about whether "a government agent actively misled him about the state of the law defining the offense;"  That is irrelevant.  Many who entered the Capitol Grounds or Capitol building were *given authorization* explicitly or implicitly by U.S. Capitol Police officers empowered to give them that authorization.

This has nothing to do with any error of law. Part of the law concerns whether a person is allowed to enter. The Government once again wants to change the subject to argue "The defendant cannot argue that, in urging his supporters toward the Capitol, former President Trump made any "statement of law."  But at least for this Defendant, this has nothing to do with Trump.  The officers responsible

for controlling entrance into the Capitol or its grounds in fact granted authorization for many demonstrators to enter.  Under the law, they were authorized to enter the Capitol building or the grounds.

So too, earlier, Defendant was standing behind a cordon where he may have believed he and thousands of others may have been entitled to stand.  Afterall, he had walked to that point unobstructed and most certainly thousands of otherwise law abiding people don't spontaneously decide to act feloniously. When police bombard the crowd with munitions (without warnings) and officers walk the line hosing demonstrators down with OC spray and pepper spray, certain members of the crowd may respond proportionally in kind, others may engage in de-escalation techniques. When police fall back, for whatever reason, protestors may have subjective opinions as to why police fell back.  Some might believe the intention of police was to permit the crowd to advance.  The absence of use of "big voice" systems that were operational and not used would have led credence to that view. Following the crowd, at times past police who were cordial and not instructing the crowd to leave, and following the crowd into the building through open doors past non-objecting police could be reasonably  interpreted as permission.

It must not be forgotten that every year millions of foreign visitors, school field trips, journalists, art admirers, lobbyists, citizens, etc., enter and wander around in the U.S. Capitol.  That is the norm, which the Government must prove was varied from. On any given day, any one from any part of the globe can buy lunch from a

food truck vendor, lean against a tree on the Capitol grounds and enjoy their lunch sitting on the Capitol grounds.

The Chief Judge was simply wrong in arguing:  "No American President holds the power to sanction lawless actions because that would make a farce of the rule of law." *Chrestman,* 525 F. Supp. 3d at 32."   To ignore the terms of the law would be wrong. In fact, <u>*every officer*</u> posted at an entrance to any Federal building holds the power to grant entrance to anyone.  This District is simply wrong and the error must be corrected.  Those assigned to guard an entrance of course have power to determine who may enter and who may not enter.

**2.** <u>First Amendment</u>

Once again, the Government strains to redefine the question in order to argue against something that is entirely irrelevant.

This Court lacks any jurisdiction or power to prosecute, convict, or punish any U.S. Citizen for an exercise of any of the explicit or implied rights under the First Amendment.  No court has the power under the Constitution to violate the First Amendment.

In response to this severe limitation imposed by the U.S. Constitution, the Government tramples on the Constitution by claiming that the First Amendment does not change an illegal act into a legal act.  That is absurd.  No one is claiming that. The exercise of First Amendment rights is never a crime to begin with.

What is not a crime to start with does not need to be immunized or made legal.

Nothing changes an illegal act into a legal act.  The conduct guaranteed by the First Amendment is legal already.  It does not need to be transformed.

To address this absurd distraction, no one doubts that a person robbing a liquor store while reciting the movie speech of King Richard III about St. Crispin's Day is still robbing a liquor store.  Making a speech does nothing to change the underlying conduct.

Yet if someone were prosecuted _because_ they are making a speech or believe something that the jury finds offensive, then the Court, the prosecutors, and the jury are in violation of the U.S. Constitution including 18 U.S.C. 241 "Conspiracy Against Rights."

The robber can obviously be prosecuted for robbing a liquor store.

The robber cannot be prosecuted for reciting the speech from "Richard III."

But "dollars to donuts" one can take it to the bank that the Government will try to inflame the passions of the jury with every Defendant's political beliefs.

Again, because this somehow seems to baffle many people:

- Expressing political beliefs does not change the nature of overt conduct. If the conduct is illegal it does not matter if it is done silently or in combination with expressing political beliefs. It is of no consequence.

- But this U.S. Department of Justice is spending much of every January 6 criminal trial intentionally inflaming and inciting juries into lawless verdicts based on passions instead of facts.  No person may be prosecuted or found guilty or punished for what they believe or what they say.

It is unconstitutional to punish a person for his or her expressions of free speech

guaranteed as rights under the First Amendment, except within the narrow and strict test

*Brandenburg v. Ohio*, 395 U.S. 444, 448 (1969).

> [T]he constitutional guarantees of free speech and free press do not
> permit a State to forbid or proscribe advocacy of the use of force or
> of law violation except where such advocacy is directed to inciting
> or producing imminent lawless action and is likely to incite or
> produce such action.  * * * A statute which fails to draw this
> distinction impermissibly intrudes upon the freedoms guaranteed
> by the First and Fourteenth Amendments."

*See also NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982) and *Hustler Magazine
v. Falwell,* 485 U.S. 46 (1988) (*"*The fact that society may find speech offensive is not a
sufficient reason for suppressing it" – Chief Justice William Rehnquist"), under 18
U.S.C. 241.

> If the line drawn by the decree between the permitted and
> prohibited activities of the NAACP, its members and lawyers is an
> ambiguous one, we will not presume that the statute curtails
> constitutionally protected activity as little as possible. For
> standards of permissible statutory vagueness are strict in the area
> of free expression. See *Smith* v. *California*, 361 U.S. 147, 151;
> *Winters* v. *New York*, 333 U.S. 507, 509-510, 517-518; *Herndon* v.
> *Lowry*, 301 U.S. 242; *Stromberg* v. *California*, 283 U.S. 359;
> *United States* v. *C.I.O.*, 335 U.S. 106, 142  (Rutledge, J.,
> concurring). *N.A.A.C.P.* at 432.

 *N.A.A.C.P. v. Button*, 371 U.S. 415, 83 S. Ct. 328 (1963).

> *NAACP v. Claiborne Hardware Co*., 458 U.S. 886 (1982) explains (emphasis
added):

> The boycott of white merchants in Claiborne County, Miss., that
> gave rise to this litigation had such a character; ***it included
> elements of criminality and elements of majesty.***
> * * *
> The Mississippi Supreme Court quoted from the trial court:
> In carrying out the agreement and design, certain of the
> defendants, acting for all others, engaged in acts of physical
> force and violence against the persons and property of
> certain customers and prospective customers. Intimidation,
> threats, social ostracism, vilification, and traduction were
> some of the devices used by the defendants to achieve the
> desired results.

* * *

This U.S. Supreme Court decided that:

* * *  As we so recently acknowledged in *Citizens Against Rent Control/Coalition for Fair Housing v. Berkeley*, 454 U. S. 290, 454 U. S. 294,

> "the practice of persons sharing common views banding together to achieve a common end is deeply embedded in the American political process."

The Supreme Court concluded:

The right to associate does not lose all constitutional protection merely because some members of the group may have participated in conduct or advocated doctrine that itself is not protected.

The Court is literally forbidden by the force of the U.S. Constitution from allowing the Defendant to be prosecuted, or convicted, or punished for the exercise of First Amendment rights.  And because we can never know what happened in the confidentiality of jury deliberations and we cannot "unring the bell," the contamination of political beliefs cannot be permitted into the trial.

## V.    CONCLUSION

Defendant requests of the Court that the representations of the Government in its Motion be considered only as illustrative of what it is argued and not as accepted facts.  The facts will be sharply disputed at trial.  As clarified above and limited to what it appears the Government actually means, the Defendant agrees with keeping confidential the location of cameras (that is, not adding to the abundantly obvious locations of cameras) and agrees to refrain from discussion

of "secret service protocols" other than those already catalogued under Page 9 and 10 of the Government's motion and concerning how the alleged restricted area was or was not established and whether or not any protectee was present at the Capitol at 3:06 PM to 4:20 PM EST on January 6, 2021.

Defendant agrees and asks that the Court allow admission of the entire Congressional Record from January 6, 2021, except possibly where there appears to be some short business totally unrelated to the counting of the Electoral College votes or any other business by the Joint Session of Congress.

Defendant asks that the Court reject a confused and imprecise Motion in Limine concerning "Entrapment by Estoppel" where the Government is not clear, perhaps asking the Government to redraft what it is saying. Defendant understands "Entrapment by Estoppel" to have no relationship to the common concept of entrapment.

Defendant insists under the force of the U.S. Constitution that the Court has no power to prosecute, convict, or punish any person for their political beliefs (including beliefs about the errors or failings of the government, rather than partisan politics) or for exercising any explicit or implied rights under the First Amendment to the U.S. Constitution.

Defendant agrees with the concept that what is a crime does not stop being a crime when combined with First Amendment expression but does not understand why or how that would ever be relevant to this case.

Defendant's counsel is aware that some January 6 Defendants have cited precedents that the First Amendment authorizes a person exercising their First Amendment rights to be present on the U.S. Capitol grounds or in the Capitol building. However, this Defendant argues that he had that right regardless of the First Amendment because only the U.S. Secret Service can

declare a restricted building or restricted grounds – which they did not do in relation to January 6, 2021.

December 30, 2024                    **RESPECTFULLY SUBMITED,**

                                    *Counsel for Defendant*

                                    /s/ Brad Geyer
                                    Bradford L. Geyer, PHV
                                    NJ 022751991
                                    Suite 141 Route 130 S. 303
                                    Cinnaminson, NJ 08077
                                    Brad@FormerFedsGroup.Com
                                    (856) 607-5708

## CERTIFICATE OF SERVICE

I hereby certify that on this date my law firm is filing the foregoing with the Court by its ECF record-keeping and filing system on the date stated just above, which automatically provides a copy to:

MATTHEW M. GRAVES
UNITED STATES ATTORNEY, by:

Sean Brennan
DOJ-USAO
Criminal Division - Capitol Siege Section
601 D St NW
Washington, DC 20579
202-252-7125
sean.brennan@usdoj.gov

Benet Kearney
U.S. ATTORNEY'S OFFICE
26 Federal Plaza
New York, NY 10278
212-637-2260
benet.kearney@usdoj.gov

David Perri
USAO
LRM: Weaver, Tracie
Federal Building United States Courthouse
1125 Chapline Street, Suite 3000

Wheeling, WV 26003
304-234-0100
304-234-0111 (fax)
david.perri@usdoj.gov

Karen E. Rochlin
DOJ-USAO
99 Northeast 4th Street
Miami, FL 33132
305-961-9234
karen.rochlin@usdoj.gov


/s/ Brad Geyer
Bradford L. Geyer, PHV